### 812. BRAND *v.* THE STATE.

1. This court approves the following construction of subsection 2 of section 420 of the Penal Code, relating to the running of freight-trains on the Sabbath day as given to the jury by the trial judge: "Where a train which is running on a bona fide, practicable schedule, leaving the starting point on Saturday night, scheduled to reach its destination before 8 o'clock Sunday morning, is detained by unavoidable circumstances, so that it can not reach its destination by 8 o'clock Sunday morning, it can, nevertheless, continue to run even after 8 o'clock Sunday morning, until it reaches its destination, without violating the law. In determining what is unavoidable, the movement of this train should not be considered as an isolated train running over the road and leaving out of consideration other trains, but this train should be considered in relation to other trains, and as one unit in a complex whole."

2. It being admitted that a freight-train did run on Sunday morning after 8 o'clock, the burden was on the defendant to show that this was not done in violation of the statute. This burden is not successfully carried

by showing that the schedule on which the train was running was capable of being complied with, and was ordinarily carried out, but that in this particular instance the train was prevented from completing its trip within the schedule time, by unavoidable delays in waiting for other trains which were themselves delayed. The evidence should go further and show that the delays of the other trains, causing the delay of this particular train, were themselves unavoidable. Especially is this true where the defendant admits that the trains were frequently delayed in making the schedule on Sundays, and no effort had been made to remedy the evil.

3. The railway officials should in good faith endeavor to avoid the necessity that a freight train, duly started on Saturday night, should have to run after eight o'clock Sunday morning to reach destination; but a mere failure to exercise ordinary care in this respect is not necessarily criminal. An instruction to the jury which made lack of ordinary care, and not lack of good faith and honest endeavor, the test of criminality was erroneous, and sufficiently material to justify the grant of a new trial. (HILL, C. J., dissents.)

Indictment for running freight train on Sunday, from DeKalb superior court—Judge Roan. October 19, 1907.

Argued December 9, 1907.—Decided February 14, 1908.

*Joseph B. & Bryan Cumming, M. A. Candler,* for plaintiff in error. *William Schley Howard, solicitor-general, J. D. Kilpatrick,* contra.

HILL, C. J. Brand, as superintendent of the Georgia Railroad, was convicted, in DeKalb superior court, of running a freight-train on the Sabbath day in violation of the Penal Code, §420. The judgment refusing a new trial is brought to this court for review. The case was submitted to the jury, under the charge of the court, on an agreed statement of facts, which may be summarized as follows: The freight-train in question left Augusta on its regular schedule time, 11:20 o'clock p. m. on Saturday night, September 1, and by its regular schedule should have reached Atlanta, its destination, at 7:50 o'clock a. m. Sunday morning, September 2. It did not arrive at its destination until 11:20 a. m. Sunday. Its failure to complete the trip in its regular schedule time was due to two classes of delays, one class being the ordinary delays incident to the running of the train, which delays were allowed for in the regular schedule; the other class, growing out of long delays in meeting and passing other trains, were unusual delays, not allowed for in the schedule. These unusual delays, aggregating four hours and thirty minutes, prevented the train.

from making its regular schedule. The train, even with these unusual delays, of four and a half hours, got into Atlanta only three and a half hours late. The schedule under which this train left Augusta to arrive in Atlanta was one perfectly capable of being run by a freight-train. The capacity of the locomotive and the load of this particular train were such that, had there not been the unusual delays, it could have made the trip in schedule time. This schedule is run every day except Sunday, and is one that is frequently made on time. The train always leaves Augusta, the initial point, on schedule time on Saturday nights. On week days it sometimes leaves behind time, but not infrequently makes up a part of the lost time and makes the run to Atlanta in less than the time allowed by the regular schedule. In the opinion of the superintendent, who has had fifteen years experience in the transportation service of the railroad, this freight train, if permitted to leave the starting point on time, will ordinarily make the schedule between Augusta and Atlanta, provided it meets with no unusual delays. These unusual delays come about from time to time, but such delays are not normally expected, and on this occasion it was not known that these delays would take place before the train started from Augusta; and that they would take place developed only a short time before the actual time of the occurrence. The superintendent, while not having any specific knowledge of the actual running of this particular freight-train on the date in question, did know that a number of similar trains, running on the same or similar schedules, had run through De-Kalb county after 8 o'clock on Sundays, the delays to such trains being of the same general character as the delays to this particular train; and he has not prohibited or checked the running of such delayed trains.

The first question for determination arises on the construction of subsection 2 of section 420 of the Penal Code. The general section prohibits the running of any freight-train on the Sabbath day. This policy, while finding its inspiration in the religious sentiment of the people, has been adopted by the State because it has been demonstrated that the moral and physical welfare of the citizen demands one day of rest in each week. This mandate of the State is not aimed alone at the running of freight-trains, but applies to all secular occupations, excepting only those of necessity

or charity. To this law prohibiting the running of freight-trains on the Sabbath day the legislature has made three exceptions. The first exception was made by the act of February 20, 1873 (subsection 1 of section 420), in the interest of domestic animals transported on the Sabbath day. This relaxation of the general rule permitted a train having one or more cars loaded with live stock to run on to a stock-pen, where the animals could be fed and watered. The second exception to the general statute is contained in the act of February 28, 1874, and the purpose of its enactment, as declared in the preamble of the act, was the social and religious benefit of railroad employees. This is the exception which this court is called upon to construe. The third exception is contained in the act of 1894 (subsection 3 of section 420). It makes provision for the transportation of perishable fruits, melons, vegetables, fresh fish, oysters, fresh meats, live stock, and other perishable goods of like character, and provides that trains loaded with these commodities which leave the initial point before the hour of midnight on Saturday may run to the point of destination in the State, or through the State, on Sunday. This digression from the particular point under consideration illustrates the legislative policy of the State relating to the running of freight-trains on the Sabbath day.

We come now to the construction of the statute sub judice, which makes an exception to the general rule against running freight-trains on Sunday. This exception makes it lawful to run a freight-train on the Sabbath day, provided the train starts on Saturday night, and "the time of its arrival at destination according to the schedule by which it started on the trip be not later than 8 o'clock Sunday morning." Does this exception require freight-trains to arrive at their destination at all events not later than 8 o'clock Sunday morning, or does the time of arrival refer to the schedule, and not to the time of arrival? It is an elementary rule of construction that a statute shall be so construed as to give meaning to every part. If this exception applies to the time of arrival at destination, then the words in the statute, "according to the schedule by which it started on the trip," would be meaningless. Not only would this be so, but if the prohibition is to be literally construed against the running of freight-trains, under any and all circumstances, after 8 o'clock on Sunday morn-

ing, then, wherever such trains might be when the hour of eight arrived, they would either have to stop at that point on the road, or, at most, go. to the next station and there stop. This construction would leave out of consideration the language of the statute, —"according to the schedule by which it started on the trip," and would destroy the purpose of the act, declared in the preamble, of permitting the employees of freight trains to spend the Sabbath, or a portion thereof, with their families, and to be given an opportunity of attending religious services in their respective churches. This court can give no clearer or more reasonable interpretation of this statute than that given by the learned judge of the trial court, and we fully approve and adopt such interpretation. "If you find, from the evidence, that the train left its starting point on Saturday night, upon a schedule which provided for its arrival at its destination not later than 8 o'clock Sunday morning, and if you further find that this schedule was made in good faith, and that it was one capable of being carried out under ordinary conditions, then I charge you that the defendant would not be liable, if this train failed to reach its destination by the schedule time, and continued to run after 8 o'clock Sunday morning, provided that there was at all times an effort in good faith, upon the part of the defendant and its officers and agents, to carry the train through according to its schedule. I further charge you that where a train which is running on a bona fide, practicable schedule, leaving the starting point on Saturday night, scheduled to reach its destination before 8 o'clock Sunday morning, is detained by unavoidable circumstances, so that it can not reach its destination by 8 o'clock Sunday morning, it can, nevertheless, continue to run even after 8 o'clock Sunday morning, until it reaches its destination, without violating the law. In determining what is unavoidable, the movement of this train should not be considered as an isolated train running over the road and leaving out of consideration other trains, but you should consider this train in relation to other trains, and as one unit in a complex whole, wherein it may not be possible to deal with the one unit entirely without reference to the other parts of the business."

We think these instructions of the court present the correct construction of the statute in question. They make the controlling and vital question in the case one of good faith in establishing

the schedule, and good faith in maintaining it. The stipulation that the schedule in question was one perfectly capable of being run by a freight-train, from its initial point in Augusta to its destination in Atlanta, within the limitations of the statute, and was a schedule not only frequently run, but one which in the opinion of the superintendent would ordinarily be run on time, provided it met with no unusual delays, might have authorized the jury to find that the schedule was made in good faith, though there were other circumstances authorizing the contrary conclusion. We can not say, however, that the jury, in applying to the facts the interpretation of the statute as given in charge, rendered a verdict without evidence to support it and contrary to the said instructions. Granted that the schedule was made in good faith, and was one that under ordinary circumstances could be successfully run, yet the superintendent admitted, that a number of freight-trains on the same schedule had run through DeKalb county after 8 o'clock Sunday morning, in apparent violation of the statute; and that the delays of such trains in making the schedule were due to facts and circumstances of the same general character as those which caused the delay in the present case.

When it was admitted in this case that the freight-train was run in DeKalb county after 8 o'clock on Sunday, the burden of proof was on the defendant, to excuse and justify such presumptive violation of law. Penal Code, §421; *Jackson* v. *State, 88 Ga.* 787 (15 S. E. 905); *Seals* v. *State,* 121 *Ga.* 741 (49 S. E. 740). It may well be doubted if the burden was successfully carried, in a case where frequent similar failures to maintain the schedule were admitted, and no effort to remedy the evil was shown. In addition to this suggestive admission, it may be also noted that in this particular instance, while the delay beyond the schedule time in arriving at destination is attributed to long delays in waiting for trains going in the opposite direction, yet the agreed statement is silent as to the cause or causes which delayed all these other trains. And before the failure to comply with the schedule in this particular case can be fully excused or justified, it would seem reasonable to require proof that the delays of the opposing trains were themselves caused by unavoidable circumstances. In other words, the defendant in this case did not entirely meet the obligation imposed by law, without showing that the delay to this

particular train was caused by unavoidable and unusual delays to all the other trains. In the language of the instruction, the jury, in determining what was unavoidable, should consider the movement of this train not as that of an isolated train running over the road and leaving out of consideration other trains, but should consider this train in relation to other trains, and as one unit in a complex whole.

Penal statutes are made to be enforced, and it is the duty of good citizenship not only to give passive obedience, but active support, to statutes made for the purpose of conserving the physical, social, and moral welfare of the citizen. We do not question the sincerity of the declaration of the eminent and learned counsel for plaintiff in error, that "the railroad company desires to transact its business promptly, and still more earnestly to do so within the law." Nor do we question the good faith of the superintendent in making this particular schedule; yet, in view of the admission that freight-trains had on numerous occasions failed to comply with the schedule, because of delays, we think some effort by the railroad company to reduce the frequency of such occurrences should have been shown. It is hardly sufficient, on the point of maintaining or running the schedule, to show that the schedule was perfectly capable of being carried out and was in fact frequently carried out. The defendant should have gone a step further and shown that every reasonable and diligent effort had been made to avoid the delays, not only to the particular train, but to all the other trains whose delays caused or contributed to the delay in question.

The entire court is thoroughly agreed as to what has been said above, and, if it were not for the assignment of error now to be considered, the judgment would be affirmed. However, exception is taken to the following charge of the court: "I charge you that the law will not excuse on the ground of unavoidable delays caused by accident, when, by the use of ordinary care in running the train according to its established schedule, the running of the freight-trains on Sundays after eight a. m. could be avoided." As to this, the writer is authorized to state the views of the majority of the court thus: In addition to considering the instruction to be confusing (for the idea of an unavoidable delay caused by accident is entirely opposed to the idea of that which can be

avoided by ordinary care), we think that the test of criminal re-sponsibility in cases of this class, as well as in most others, depends upon good faith or lack of good faith, and not upon negligence or the exercise of ordinary care, except in those cases where the negligence is so gross as to amount to criminal negligence. Criminal negligence is a very different thing from a failure to exercise ordinary care; indeed, it is opposed to all idea of good faith. In this case the train in question was delayed, by waiting to meet a train which in turn was delayed by having to wait for a passenger-train, which left Augusta late because it waited for a connection from the east. If the train in question was started out by the company under the bona fide belief that it would be able to make the trip in accordance with its schedule, and was held up afterwards by delays caused by the detention of the passenger-train, the defendant would not be criminally responsible, although the jury might have believed, that, in the exercise of that foresight which an ordinarily prudent person would have exercised, the delay of the train on the connecting line might have been anticipated long enough in advance for some means to have been devised whereby the detention of this freight-train might have been avoided. Mistakes of judgment and lack of usual foresight may be negligent, without containing that element of mala fides essential to criminality. We are not willing to hold, that it was criminal to detain this passenger-train at Augusta for its passenger and mail connection from the east, although, as a result thereof, the running of the freight-train on Sunday was necessitated; nor that the running of this train after 8 a. m. Sunday was criminal, if, when it left Augusta, the company did not anticipate the concatenation of delays which finally brought about the result, though by ordinary care it might have done so. The majority of the court, therefore, consider this error material and reversible.

The writer is constrained to dissent from the view of the majority of the court as to the excerpt quoted from the charge. In his opinion, the proper construction of this excerpt is that the law would "not excuse on the ground of unavoidable delays," if there was in fact no such "unavoidable delay;" and that a delay which could have been avoided by the use of ordinary care could not be set up as an excuse for violating the statute. Delays of this character, although claimed to be unavoidable, are not in fact unavoid-

able, if they could have been prevented by the exercise of ordinary · care and diligence on the part of the railroad company. This instruction was not contradictory or antagonistic to the test of good faith in making and maintaining the schedule, but was simply explanatory of the term "unavoidable delays." The writer does not think that a railroad company successfully carries the burden which the law imposes upon it, unless it shows that the schedule was made in good faith and maintained in good faith; but where it is claimed in a particular case that the delay of the train was caused by unavoidable delays, such delays must appear to have been in fact unavoidable, and no delay can be deemed unavoidable which the exercise of ordinary care on the part of the railroad company could have prevented.

It is probable that the jury, being composed of practical men, did not make the nice, refined distinctions between ordinary care and good faith made by the majority of the court and the writer, but concluded that as the evidence indisputably showed repeated failures on the part of the railroad company to make the schedule according to the requirements of the statute, and no effort on its part to remedy the evil, with the rather narrow margin of ten minutes to make a freight-schedule requiring the running of 171 miles in eight and a half hours, and in this particular case showed no diligence to prevent the delays claimed to have been unavoidable, a verdict of guilty was not unwarranted.

*Judgment reversed. Hill, C. J. dissents.*