## 21168. NORMAN v. THE STATE.

DECIDED SEPTEMBER 17, 1931.

*Paul S. Etheridge, Hewlett & Dennis, T. F. Bowden,* for plaintiff in error.

*John A. Boykin, solicitor-general, J. W. LeCraw, John H. Hudson, W. S. Howard,* contra.

LUKE, J. ■ T. J. Norman was convicted under the second count of an indictment drawn under section 20 of article 20 of the banking act (Ga. L. 1919, pp. 135, 216; Park's Penal Code Supp. (1922), § 2281 (t); Michie's Penal Code (1926), § 211 (20)). That count charges "T. J. Norman with the offense of embezzlement (wilful misapplication), for that accused, in County of Fulton, State of Georgia, on the 12th day of February, 1925, and on divers other dates and occasions during the years 1923, 1924, and 1925, as will be hereinafter set out more specifically, with force and arms, did, jointly with J. S. Slicer, unlawfully and wilfully misapply moneys, funds, securities, and credits belonging to Colonial Trust Company, a chartered bank, incorporated under the laws of Georgia, to the sum and value of ———————— dollars, with intent to injure and defraud said bank, T. J. Norman being vice-president of said bank and J. S. Slicer being president of said bank, and said moneys, funds, securities, and credits of said bank so wilfully misapplied having come into the hands, custody, and control of said the said Norman and Slicer by virtue of their said official positions above set forth,—said offense and each of the various items of wilful misapplication hereinafter set forth being unknown until and after the first day of July, 1926, —the said moneys, funds, securities and credits being wilfully misapplied by the said Norman and Slicer in a series of transactions, which the grand jurors do hereby charge and itemize as follows, the description given in each of the following items as to the moneys, funds, securities, and credits so wilfully misapplied being as complete a description as the grand jurors are able to give, other description being to the grand jurors unknown:

"Item 1. By taking in, as an asset of said bank, January 29, 1924, a promissory note of C. G. Aycock Realty Company in the sum of $3,500 in favor of Colonial Trust Company, which note was worthless, accused having then and there given to the said C. G. Aycock Realty Company a written statement agreeing not to hold said company responsible in any way for said note; and in said transaction the said Norman and Slicer did wilfully misapply $3,500 in money, of the value of $3,500 belonging to said bank, paying the same out upon check # 13566, drawn on money of said bank in the Fulton National Bank, of Atlanta, Ga., in favor of C. G. Aycock Realty Company."

Item 2 contains allegations similar to those of item 1 in reference to a note of C. G. Aycock for $2,930.75, taken as an asset of said bank on February 17, 1923, and due four months after that date, but contains no allegation that there was any agreement to hold Aycock harmless in regard to said note.

Item 3 is similar to item 1, except that it has reference to a note of C. G. Aycock Realty Company for $1,170, taken as an asset of said bank on October 26, 1924, and contains no allegation that the maker of the note was not to be held responsible for said note.

Item 4 alleges that defendants took as assets of said bank on August 22, 1923, four notes, dated July 19, 1923, signed by Royston Cabaniss, and aggregating $12,042.78.

Item 5 has reference to a note of Royston Cabaniss for $2,275, taken and dated January 13, 1925.

Item 6 is as follows: "By taking as assets of said bank Aug. 31, 1923, two notes in the sum of $8,525 each, bearing names of Irad R. Moore and Kirby Collins as makers thereof, respectively, and each dated Aug. 30, 1923, due on demand, payable to Colonial Trust Company, said notes being worthless; and in said transaction accused did pay out the sum of $17,050 in money belonging to said bank in Fulton National Bank, by check # 12211 payable to F. L. Beers, deputy clerk, in the sum of $15,500, and check #12212 payable to G. G. Long in sum of $1,550, the said Norman and Slicer thereby wilfully misapplying the said $17,050 of the said bank's moneys and assets."

Item 7 has reference to two notes of G. G. Long, dated September 23, 1924, and aggregating $1,925; it being alleged that said notes were worthless, and that the proceeds thereof were credited to the account of J. S. Slicer in the Colonial Trust Company, and paid out of the funds of said bank.

Item 8 follows: "By paying out the sum of $6,000 in money of said bank, checking out the said money from funds of said bank deposited in the Fulton National Bank, by checks #13526 in favor of Mrs. Maud Muldrew in the sum of $3,000, and #13540 in favor of Mrs. A. P. McGee in the sum of $3,000, each dated on or about Jan. 26, 1924, said Norman and Slicer thereby wilfully misapplying the said six thousand dollars in money and marking said transaction on the 'control ledger' of said bank as being paid to said Mrs. Maud Muldrew and Mrs. McGee in the amounts

above stated, entering same as a charge to 'accounts payable' in the sum of $6,000, but not subtracting the said amounts from the amounts due to be paid to said Mrs. Muldrew and Mrs. McGee in the 'accounts payable' ledger, said acts thereby constituting a false and fraudulent entry, and thereby aiding and concealing the said act of wilful misapplication, and said Norman and Slicer eventually paying to said Mrs. Muldrew and Mrs. McGee the entire amounts shown on said 'accounts payable' ledger to be due them at the time the above wilful misapplication was done."

Item 9 has reference to a note of C. Hines taken as an asset of said bank January 31, 1924, and being for the principal sum of $2,147.71, and payable to Colonial Trust Company; it being alleged that defendants "did pay out the sum of $1,851.49 . . belonging to said bank, checking it out of funds of said bank on deposit in the Fulton National Bank, Atlanta, Ga., by checks dated Jan. 31, 1924, payable to C. Hines, thereby wilfully misapplying said amount."

Item 10 follows: "By taking as assets of said bank Nov. 21, 1924, two certain notes of H. C. Brooks for $3,000 each, which were worthless, and in said. transaction marking paid and cancelling the following assets of said Bank: promissory note of Frank Witt in sum of $5,900 and G. G. Long in the sum of $100, both in favor of Colonial Trust Company, . . being of the value of $6,000 and property of said bank, thereby misapplying the above notes belonging to said bank."

Item 11 is as follows: "By taking in as assets of said bank Oct. 17, 1924, three notes of H. G. Perkins in sums of $3,000, $3,431.77, $2,669.40, respectively, dated Oct. 15, 1924, all in favor of Colonial Trust Company, said notes being worthless, accused having given a written statement in name of said bank guaranteeing that said Perkins would be held harmless on said notes, the said Norman and Slicer marking paid and cancelling in said transaction the following assets of said bank of the value of $9,-101.07; a promissory note of Mrs. M. B. Owens in sum of $5,669.40 dated on or about Feb. 9, 1923, payable to Colonial Trust Company, due June 9, 1923, being a mortgage note on real estate at 465 and 467 North Boulevard, Atlanta, Fulton County, also promissory note of E. S. Veal in the sum of $3,431.77, dated on or about Jan. 23, 1924, being a mortgage note on real estate on

Howard Street, Atlanta, Ga., the said Norman and Slicer thereby wilfully misapplying the said securities belonging to said bank."

Item 12 follows: "By fraudulently paying over to the Security State Bank, a corporation, $10,986.86 of the assets of the Colonial Trust Company by means of establishing a credit in the sum of $10,986.86 in favor of the Security State Bank on the books and records of said Colonial Trust Company, Feb. 12, 1925, and thereby causing the Colonial Trust Company to lose the amount of $10,986.86 in credit and assets, said Norman and Slicer making and causing to be made on the 'control ledger' of the Colonial Trust Company the following entry as the reason for paying over the said $10,986.86 to the Security State Bank: 'Loans held by Security State Bank on Va. Circle property paid by C. T. Co. and charged to real estate account . . .'"

Item 13 was abandoned and not submitted to the jury.

Item 14 has reference to taking, as assets of said bank on September 10, 1924, "a series of notes in name of S. C. Long as maker, in favor of Colonial Trust Company, dated August 7, 1924, due monthly, being 35 notes of $72 each, and the last one $1,417.62, in total sum of $3,937.62, bearing notation that said notes were on "150 Allene Av and 162 Elbert street;" also a series of 36 notes in name of S. C. Long as maker, in favor of said bank, dated August 7, 1924, due monthly, being for $72 each except the last one for $1,174, in the total sum of $3,694, bearing notation that said notes were on "127 White street and 147 Brookline;" all said notes being worthless; and in said transaction said Norman and Slicer did wilfully misapply the sum of $6,715 in money and funds of Colonial Trust Company, ostensibly paying the said money out for the above-described notes according to the entries which the said Norman and Slicer made and caused to be made upon the books and records of said bank."

Item 15 follows: "By taking in as assets of said bank on or about Oct. 10, 1924, three notes in the name of H. M. Pasley as maker thereof in the sum of $3,000 each, dated Oct. 9, 1924, in favor of Colonial Trust Company, said notes being worthless, and in said transaction the said Norman and Slicer did wilfully misapply the sum of $9,000 . . belonging to said bank, drawing three checks in the sum of $3,000 each for said money upon the money of said bank on deposit in the Fulton National Bank,

said checks being entered upon the books of said bank as ostensible payment for the above-described worthless notes."

The last item, numbered 16, was abandoned and not submitted to the jury.

The plaintiff in error insists upon twenty-four of the thirty-five grounds of his demurrer, all of which relate to the second count of the indictment.

Ground 11 of the demurrer is that the second count charges sixteen "separate and independent alleged crimes." The point made is controlled in principle by the ruling in *Jackson* v. *State,* 76 *Ga.* 551, the seventh headnote of which reads: "Where the indictment contained but a single count. charging various acts of the same character, which, taken together, went to make up the offense charged, there was no error in refusing to compel the State to elect on which of these acts it would try the defendant." See the same case, page 572. In this connection see *Camp* v. *State,* 31 *Ga. App.* 737 (122 S. E. 249). We hold that the trial judge properly overruled this ground of the demurrer.

Ground 12 is that said count "charges no crime against this defendant." The indictment is in the language of the statute and complies with the requirements of the Penal Code (1910), § 954, and there is no merit in the ground. See *Jackson* case, supra, page 551 (13), 574; also the companion case of the case at bar, *Slicer* v. *State,* 172 *Ga.* 445 (157 S. E. 664).

Ground 13 is that said count contains "three separate and independent alleged crimes, to wit:" that the defendant (1) embezzled, (2) abstracted, and (3) wilfully misappropriated moneys, funds, securities and credits belonging to the Colonial Trust Company. It is apparent from the indictment that it was the intention of the State to charge "wilful misapplication." There is no merit in this ground. See *Slicer* case, supra; also *Jackson's* case, supra.

Ground 14 complains that said count sets out no facts showing when or how said moneys, etc., were abstracted, or that the "same were wrongfully converted or appropriated to the use of defendant," or that Colonial Trust Company lost said moneys, etc. We hold that the indictment is not subject to the criticisms contained in this ground. See *Jackson* and *Slicer* cases, supra.

Ground 15 is that "the expression abstracted any of the moneys,

funds, securities and credits from said bank . . fails to charge any crime, and is void because the same is so indefinite and uncertain as to be incapable of enforcement, and the same fails to sufficiently define the act or thing which it undertakes to make unlawful and penal." There is no merit in this ground. See *Jackson* and *Slicer* cases, supra.

The gist of ground 16 is that the charge that the defendant wilfully misapplied moneys, etc., is a mere conclusion of the pleader, and that there are no facts showing when or how said moneys . . were wilfully misapplied, converted or appropriated to the defendant's use, and that there is no allegation of fact that Colonial Trust Company lost any of said moneys, etc. The indictment follows the statute, and is not subject to the demurrer. See authorities cited.

Ground 17 is "that the expression wilfully misapplied moneys, funds, securities and credits from said bank . . fails to charge any crime, and is void, because the same is so indefinite and uncertain as to be incapable of enforcement, and the same fails to sufficiently define the act or thing which it undertakes to make unlawful and penal." This ground is not meritorious. See authorities heretofore cited.

Ground 18 follows: "Defendant demurs to the . . expression in said second count, . . that defendant abstracted moneys, funds, securities and credits belonging to the Colonial Trust Company on the ground that there is no allegation of facts showing that defendant appropriated to his own use any of said alleged assets." This ground is not meritorious.

Ground 19 is the same as the preceding ground, except that it has reference to the expression "wilfully misapplied." There is no merit in it.

The remaining grounds of the demurrer, 20 to 35 inclusive, contain the same criticism of the sixteen items of the indictment. Therefore it is only necessary to set out one of these grounds. Ground 20 is as follows: "Defendant demurs to the second count of said indictment and to transaction No. 1 therein, on the ground that there is no allegation of fact therein showing that the defendant appropriated to his own use all or any part of the assets referred to therein, and on the ground that the expression "wilfully misapplied $3,500" is a mere conclusion of the pleader with-

out any facts showing how said misappropriation was made or how defendant profited thereby, and on the further ground that the facts stated in said transaction 1 do not constitute the crime of embezzlement charged in said indictment." We quote from the opinion in the *Jackson* case, supra, as follows: "Had the indictment stated simply the amount embezzled at divers times during the period covered by these peculations, and set forth the means resorted to in order to embezzle, steal, secrete and fraudulently take and carry away the money belonging to the corporation, and which came into the hands of the defendant as its president, to whose custody it was committed, and who had, by virtue of his office, these funds in his custody, etc., and that he did thus embezzle, etc., the entire amount converted, it would, under the Code, have been sufficient, and would certainly have been preferable to one setting out, with minute and unnecessary particularity, the circumstances attending the transaction from its commencement to its consummation." We hold that grounds 20 to 35, inclusive, of the demurrer are without merit. See the *Slicer* and other cases herein cited. In conclusion, we hold that the court did not err in overruling the demurrer as a whole.

■ The contention presented by the exceptions pendente lite, that counsel for the State were disqualified in the case, is not for decision, for the reason that it is not mentioned in the briefs filed in behalf of the plaintiff in error. However, were that question passed upon, we would be constrained to hold that it is not meritorious.

■ We come next to the general grounds of the motion for a new trial. The indictment, or, rather, special presentment, shows the nature of the case; and the various transactions set out therein as constituting the offense charged indicate with some particularity the proof necessary to sustain the charge. Since the brief of evidence contains 344 pages, it is obvious that even a cursory discussion of each separate transaction would lengthen this decision beyond all reason. Therefore we shall undertake to show briefly the general nature of the case as it appears from the evidence.

The Colonial Trust Company was a bank chartered under the laws of Georgia, and operating in the City of Atlanta. It failed in September, 1926. J. S. Slicer and J. T. Norman were its

president and vice-president respectively. As such officers they handled practically all the bank's loans, taking notes for them with mortgages to secure the notes. It appears from testimony of the directors of the bank that the directors knew very little about the actual conduct of the bank's business, and that they relied principally upon Slicer and Norman for such information as they had. The bank dealt mainly in "second mortgages." From time to time, through Slicer and Norman, checks would be given to various parties for large sums of money belonging to Colonial Trust Company, and these checks would be cashed, when the persons signing the notes were neither debtors nor borrowers of the bank. In most instances the purported borrowers gave as security for their notes property that really did not belong to them, and which, in any event, was practically worthless.

In regard to "item 1" of the indictment, C. G. Aycock testified in part as follows: "I am connected with the Aycock Realty Company. . . I had transactions with the Colonial Trust Company. . . We did a considerable rent business for them. I don't know how many houses we had of theirs, but it was about the largest account we had, and the rents ran to about $3,000 a month at one time. . . I signed a note to the Colonial Trust Company. They also issued me a check in the sum $3,500, to C. G. Aycock Realty Company, drawn by the Colonial Trust Company, by T. J. Norman, dated January 29, 1924. That is my indorsement on the back, C. G. Aycock Realty Company by myself as president, and indorsed with the rubber stamp of Colonial Trust Company. I signed a note for the same amount. The note was not secured by loan deed, . . it was just a note. I did not owe the Colonial Trust Company $3,500. The reason for my signing that note . . , Mr. Slicer wanted to get $3,500 on his rent account. I told him I could not let him have it, and he suggested this method of getting it. I agreed to it, and agreed to have it retired by the rents. This check came into my hands, but I did not get the benefit of this $3,500. To the best of my recollection I gave the check back to Mr. Slicer. . . This letter on the stationery of the Colonial Trust Company, signed by T. J. Norman, secretary, to me, dated January 29, 1924, I received. That letter refers to the same transaction as the note and check about which I have just stated. I think we went from my office

to the Colonial Trust Company, and . . I think I received this letter at the same time of signing the note and indorsing the check. The signature looks like Mr. Norman's to that letter." The material parts of the letter are as follows: "We hereby agree and guarantee not to hold you responsible in any way whatsoever for note signed by you this day in amount of $3,500; for, as explained to your Mr. Aycock, this note is signed purely as an accommodation and is to be retired from the various houses you are renting for G. G. Long." (This letter was addressed to C. G. Aycock Realty Company.) The testimony of the witness Aycock continued as follows: "The $3,500 note I signed I gave back to Mr. Slicer; he said to use it in his bank. I was never called upon to pay it. . . I never did get the note back; they said it was misplaced. I talked to Mr. Norman and Mr. Slicer both about it. Mr. Norman said the note had been retired by the rents, and he supposed it was attached to the statement that went to Mr. Long. I did not pay the note, and did not retire it in any way except by the rents which I turned over to them. I never paid anything on the notes except the rents I collected for the Colonial Trust Company. I was furnished with this affidavit by Mr. Norman that the note had been lost. I don't remember seeing him sign it, but he said he fixed it up." (Here the record contains an affidavit dated January 24, 1925, and made by T. J. Norman as vice-president and secretary of the Colonial Trust Company. The gist of the affidavit is that said note "has been paid in full, and is so marked on the records of said Colonial Trust Company," that said note had been lost and could not be found after diligent search had been made for it, and that it had never been transferred to any one.)

Aycock further testified: "This note for $2,930.75, with the name C. G. Aycock as signer, I did not sign that note dated February 17, 1923, payable to Colonial Trust Company with the notation thereon, 'Property at No. 11 Virginia Circle.' This loan deed for the same amount purporting to convey property known as No. 11 Virginia Circle, with the name C. G. Aycock, I did not sign that mortgage. I don't recollect that I know either of those witnesses." "This check for $2,930.75 signed Colonial Trust Company by J. S. Slicer, dated February 7, 1923, . . on Fulton National Bank, with the indorsement C. G. Aycock and

rubber stamp of Colonial Trust Company,—I did not sign that indorsement on the back of that check. That transaction was not taken up with me by Mr. Slicer or Mr. Norman. My first knowledge of that note and mortgage came to me after the failure of the bank. . . I had no knowledge of that note being in the bank before that time. I did not own the property located at No. 11 Virginia Circle. I never had any title that I know of to that property. . . ." "This quitclaim deed with the name C. G. Aycock as signer, not witnessed, describing property at No. 11 Virginia Circle,—I did not sign that purported quitclaim deed. That resembles my signature some, but I did not sign it." "This check dated October 17, 1924, signed Colonial Trust Company by T. J. Norman, payable to C. G. Aycock Realty Company for $1,-170.09, and bearing on the back rubber-stamp indorsement, 'deposit account C. G. Aycock Realty Company and pay to Fourth National Bank,' I received this check." (Here was introduced a letter signed "Colonial Trust Company, by T. J. Norman, vice-president," addressed to C. G. Aycock Realty Company. We quote from that letter as follows: "We agree and guarantee not to hold you responsible in any way whatsoever for non-negotiable note signed by you this day in the amount of $1,170.09. This note is signed purely as an accommodation, and is to be retired by us in 90 days from this date. This note is given in order that you may realize the money on our overdraft on your landlord ledger to the amount of $1,170.09.") The witness Aycock further swore: "When I signed that note I did not owe the Colonial Trust Company $1,170.09. I was never called upon to pay it, and it was given back to me by the bank without any payment by me. It was given back to me some time after it was due. I had to go up there to see about it several times. The reason why it was marked 'non-negotiable' was because the other got misplaced." "The reason why I signed that note when I did not owe it, and never paid it, the Colonial Trust Company owed me that much overdraft on my ledger rent account, as I remember, . . and I wanted my money, and he said he would let me have it if I would handle it like this. I got the $1,170.09 on this check, and it was deposited in my bank. I put my name on that note. He said that was the only way he could let me have the money at that time, and it would accommodate him if I would do that; Mr. Slicer said

that, and Mr. Norman did not say anything about that." "When I got this letter, which has Mr. Norman's signature in this transaction, as I remember it, it was closed in the Colonial Trust Company's office, and, as I remember, Mr. Norman and Mr. Slicer both were present. I am not positive, but I made the trade with Mr. Slicer. As to coming in contact with Mr. Norman during the course of the transaction, I have a slight recollection that Mr. Slicer told Mr. Norman to draw the papers, which was done by Mr. Norman, as well as I recollect, under the instructions of Mr. Slicer." The witness concluded his testimony as follows: "In other words, the C. G. Aycock Realty Company was anticipating the rent account,—that was our understanding. I didn't have the $3,500 to advance him, and I was accommodating the Colonial Trust Company to that extent out of rents that had not been collected."

Bookkeeper H. T. Green testified that the $3,500 note came as an asset, and identified the ledger sheet which sets it up as an asset in the records of the Colonial Trust Company. The ledger shows that the note came on January 29, 1924; matured April 29, 1924; and remained in the assets of the bank until September 15, 1924, when it was marked "out."

The defendant contends that in no instance does the evidence show that he misapplied any of the assets of the bank; that in many instances the State's witnesses testified to the effect that the bank had suffered no loss; that no conspiracy between Slicer and Norman was proved; that it is not shown that Norman, or any one else procured any of the bank's funds or assets; and that the State entirely failed to make out a case.

It is not feasible to set out more of the evidence. After a careful reading of the brief of evidence, we are satisfied that the jury had the right to conclude that the defendant was guilty as charged. We are fortified in this by the fact that in the case of *Slicer* v. *State,* supra, where the evidence was very similar to that in the case at bar, the Supreme Court held that the evidence supported the verdict.

The special grounds of the motion for a new trial are numbered from 4 to 36, inclusive, and many of them raise the same questions presented by ground 4. In this ground it is contended that "the court erred in not withdrawing from the con-

sideration of the jury the transaction whereby C. G. Aycock Realty Company gave its note for $3,500 in favor of the Colonial Trust Company on January 29, 1924, for the following reasons:" 1. The alleged offense was barred by the statute of limitations. 2. The State did not prove that the alleged crime was unknown to any officers or agents of the corporation. 3. It appeared from Aycock's testimony that no crime was committed, for the reason that he testified: "I do not know how it involved the bank in any way; they owed me the money and that is the way they paid it. . . The thing I objected to, it probably put the bank in better position and me in worse position." 4. The submission of said transaction to the jury tended to deprive the defendant of his liberty, in violation of the due-process clauses of the State and Federal constitutions.

The presentment in this case was returned in September, 1929, about three years after the failure of the Colonial Trust Company in 1926, and from four and a half to six years after the dates of the various transactions making up the offense. It is alleged that the transaction referred to in this special ground occurred on January 29, 1924. The presentment contains the general allegation that said offense and each of the various items of wilful misapplication hereinafter set forth was unknown until after the first day of July, 1926. The limitation as to the offense under consideration is four years. However, the statute does not run so long as the "offender or offense is unknown." Penal Code (1910), § 30. In *Cohen* v. *State,* 2 *Ga. App.* 689 (2) (59 S. E. 4), it was said: "Where an offense is alleged to have been unknown, the State need only show that it was unknown to the prosecutor, in order to make prima facie proof of that allegation. Being a matter of defense, the defendant may rebut such proof by proving that the transaction alleged in the indictment as a violation of the law was known, and the general notoriety may be sufficient proof to establish the fact that it was not unknown." In this case there was an accusation based upon the affidavit of the prosecutor. In *Williams* v. *State,* 13 *Ga. App.* 337 (77 S. E. 189), there was an accusation charging the defendant with cheating and swindling, which alleged that "the offense set out was unknown to said M. E. Maxwell & Company until April 1, 1911." Said company was the corporation alleged to have been defrauded. We quote head-

note 1 of the *Williams* case : "Where, to relieve an accusation from the bar of the statute of limitations, a fact constituting an exception to the statue is alleged, the burden is on the State to prove the exception. (a) Where, from an accusation charging a misdemeanor, alleged to have been committed by defrauding a certain corporation, it appeared that the offense was committed more than two years before the date of the accusation, and it was alleged that the offense was unknown to the corporation until within the two years preceding the date of the accusation, the burden was upon the State to show that the offense was unknown until within that period to any of those officers or agents of the corporation whose knowledge would be imputable to it." In the opinion in that case attention is called to the fact that in *Mangham* v. *State,* 11 *Ga. App.* 427 (75 S. E. 512), the court was dealing with a presentment, "a proceeding in which there is no prosecutor." It may also be observed that there was a special presentment in the case at bar.

It is contended by counsel for the plaintiff in error that there was no proof to show that Henry Dobbs, one of the directors of Colonial Trust Company, or H. T. Green, who was also an officer of the corporation "had no knowledge of this transaction until within four years of the occurrence of the same." It is true that there was no direct evidence showing that Dobbs, the missing director, did know of the offense. However, we think the jury had the right to conclude from the testimony in the case to the effect that the directors knew little or nothing about the conduct of the business except what Slicer and Norman told them, and from the manner in which the books of the corporation were kept, and from the conduct of Slicer and Norman, and from the fact that the other directors did not know the offense was committed until the bank closed, that Dobbs was also ignorant of the fact that any offense had been committed. We therefore hold that the transaction in question was not barred by the statute of limitations because of failure of the State to show that the directors of Colonial Trust Company did not know of the commission of the offense. Green, the bookkeeper, knew that the $3,500 note of Aycock Realty Company became an asset of Colonial Trust Company, and knew that the bank's check for that amount went out for the note. However, Green did not know that Norman had given Ay-

cock a letter guaranteeing to hold his company harmless in so far as the note was concerned. Green knew of the transaction, but did not know of the offense. It is contended that the auditors of Colonial Trust Company knew of the transaction set out in Item 2 of the presentment. What has been said of Green holds true in the case of said auditors.

Many of the other grounds have reference to the statute of limitations. We have not time to go into each of them separately, and we hold here and now that no transaction referred to was barred by the statute of limitations.

We hold also that contentions 3 and 4 under special ground 4 are not meritorious.

■ Special ground 5 complains that the judge erred in that, after reading to the jury item 1 of the presentment, he failed, without request, to charge further that "the mere giving of such a letter or statement would not relieve the C. G. Aycock Realty Company," and that "unless they believed that said company was legally relieved from payment of the sum of $3,500, the bank would be in no worse position and would suffer no injury." There is no merit in this contention. In this connection see *Rheney* v. *Anderson*, 22 *Ga. App.* 417 (96 S. E. 217), and cit., to the effect that so long as the note remained in the assets of the Colonial Trust Company it was worthless and bound nobody.

■ It is further contended that the judge erred in that, after reading the said item to the jury, he failed to instruct them that "unless they believed that this transaction was unknown to any of the officers or agents of the Colonial Trust Company within the period of the statute of limitations, . . the alleged crime would be barred . . and movant would not be guilty as charged in this transaction." The judge did not charge the statute of limitations in immediate connection with each item of the indictment, and we do not think he was called upon to do so. He did charge, however: "You would not be authorized . . to convict the defendant unless it has been proven to your satisfaction, beyond a reasonable doubt, that the defendant wilfully misapplied . . the amount mentioned in this indictment, or some part thereof, within four years from the time this indictment was found and returned by the grand jury, or within four years of the time such wrongful misapplication, if any, became known." No reversible error is pointed out in this ground.

Ground 6 is substantially the same as that part of the previous ground complaining of the charge upon the statute of limitations. It is not meritorious.

Ground 7 is that the court, without request, failed to charge the jury that the burden was upon the State to show that "such misapplication was unknown to any of the officers or agents of the corporation up to a time within four years from the time this indictment was found and returned by the grand jury into this court." We doubt the correctness of the suggested charge, in that it is not limited to "officers or agents of the corporation whose knowledge would be imputable to the bank." See *Williams* v. *State*, supra. We hold that the ground is not meritorious.

The gist of ground 8 is that the court erred in charging upon the law of conspiracy, for the reason that the evidence did not warrant such a charge. We have already indicated in a general way the manner in which the business of Colonial Trust Company was conducted by Norman and Slicer. Here we shall advert to a "memorandum agreement" between Norman and Slicer, entered into on October 27, 1922. Perhaps the following quotation from that agreement will indicate its nature: "That said Slicer is conducting, in the City of Atlanta, a first-mortgage loan business, and in connection therewith has the loan agency of the Mortgage Bond Company of New York;" "that said T. J. Norman desires to purchase an interest in said business, and Mr. Slicer is willing to sell him a one-third interest therein, at the price and upon the terms and conditions hereinafter stated;" "that Mr. Slicer also owns and controls a controlling interest in the capital stock of two corporations, one known as Colonial Trust Company, and the other known as The Security State Bank. . . ." "Now, therefore, for and in consideration of the sum of $10,000, . . 1. Said Mr. Slicer does hereby sell, transfer and assign unto the said Mr. Norman a one-third undivided interest in the business so conducted by him in the City of Atlanta, including all of the assets of every character and nature belonging to said business. 2. The business shall be run under the partnership name of Slicer, Norman & Wofford, . . to continue for a period of twenty years from the date hereof, unless sooner terminated as hereinafter provided. 3. Mr. Slicer is to give only such time to the partnership business as he desires. . . Mr. Norman and

Miss G. T. Wofford are to give their whole time and attention to the affairs of the business. . . Mr. Norman . . will also have the general management of the Colonial Trust and the Security State Bank, as an executive officer of these companies. . . 12. All second-mortgage business that may come to the Colonial Trust Company and the Security State Bank shall be under the direction and control of Mr. Norman, and he shall receive all fees, commissions, or brokerage received from such second-mortgage business, and shall pay to Mr. Slicer one third of the net amount derived from said second-mortgage business, or one fourth of the gross amount derived from said second-mortgage business, whichever the said Mr. Norman may elect, . . within six months after the signing of this contract. 13. The said Mr. Norman agrees that all moneys influenced by him to be loaned on first mortgages shall be negotiated in the name of the partnership, and is to be a part of the first-mortgage loan business." "15. . . Mr. Slicer also agrees . . to vote the stock which he owns in the Colonial Trust Company and the Security State Bank in such way as to elect Mr. Norman as an executive officer of both of these companies, and to continue to keep him in said office during the term of this contract, . . . with power to act in all particulars as the executive head of said banks during such times as Mr. Slicer may be away from the offices of said companies. . . 16. The said Mr. Norman shall be entitled to receive no salary as such officer of said banks, but shall, as long as this agreement continues, receive all of the fees earned by said banks from loans made by either of them, . . but he is to pay Mr. Slicer one third of the net earnings so received by him, . . or one fourth of the gross amount derived from loans made by said banks, whichever the said Mr. Norman may elect. . ."

In many instances Colonial Trust Company took second papers on property that Mortgage Bond Company had taken first mortgages on. The commissions received by Norman were large. The evils of the system established by the foregoing agreement are very apparent, especially when viewed in the light of the record here. It may not be amiss to state that section 17, article 20 of the banking act of 1919 provides that "any officer . . of any bank who asks or receives . . any commission . . for procuring . . for any person . . any loan from . . such bank, shall be

guilty of a misdemeanor." It appears from the record that when one Long, who was a large customer of Colonial Trust Company, went into bankruptcy, and Colonial Trust Company paid into the bankruptcy court $15,500 to clear Long's property on which it had second mortgages, Norman signed a check for $1,500, handed it to Long, who indorsed it and gave it back, and that Norman received that amount as his commissions on the transaction. His commissions for August, 1923, were $3,256.38.

Time forbids going further into the question under consideration. We are satisfied that the evidence as a whole warranted the charge upon conspiracy, and so hold.

Grounds 9 and 10 complain of the court's charge upon the subject of conspiracy. It frequently happens that isolated portions of the court's charge upon a subject, when considered alone, are incomplete and apparently incorrect, though as a matter of fact they are correct when considered in the light of their context. So it is in the instances pointed out in these grounds. These grounds disclose no error when the charge upon the subject of conspiracy is considered as a whole.

■ Ground 11 is in substance that the court erred in charging the jury that they could consider other transactions than those set out in the indictment only for the purpose of showing "a fraudulent intent upon the part of the defendant, and the state of mind as the same may throw light upon the transactions set out in the indictment." The criticism of this charge is that it "instructed the jury that if movant had an evil mind, as shown by transactions other and wholly unrelated to the ones charged in the indictment, he should be held guilty of violating the banking act, in connection with the transactions charged in the indictment." The criticism is not well founded, and the court did not err in overruling this ground.

Grounds 12, 13, and 14 complain of the court's admitting evidence as to various transactions had with C. G. Aycock Realty Company and C. G. Aycock personally, for the reason that such evidence threw no light upon the crime charged, and related to transactions occurring more than four years before the return of the indictment. The evidence was not inadmissible for either reason assigned.

■ Ground 15 complains that the court erred in admitting the

"hold-you-harmless letters" written to C. G. Aycock Realty Company on Oct. 16, 1924, and signed "Colonial Trust Company, by T. J. Norman, Pres." The gist of the objections to this evidence was that such letters would not legally relieve C. G. Aycock Realty Company, and that the transaction was barred by the statute of limitations. We hold that neither objection is meritorious, and that the court did not err in overruling this ground for any reason assigned.

Grounds 16, 17, 18, 19, 20, 21, 22, 23, 24, and 25 complain of the admission of evidence concerning several transactions, for the reason that they throw no light upon the offense charged, that they were barred by the statute of limitations, and that they denied the plaintiff in error his constitutional rights. None of these grounds disclose valid reasons for reversing the judgment.

What was said in regard to the foregoing grounds (16 to 25 inclusive) applies also to grounds 26, 27, 28, 29, 30, 31, and 35.

Ground 32 complains that the court erred in not having the jury say upon which one or more of the transactions submitted to the jury under the second count they based their verdict, thereby violating the due-process clauses of the State and Federal constitutions. The question raised here was presented in a slightly different form in the 11th paragraph of the demurrer to the indictment. See, in this connection, the cases of *Jackson* v. *State,* and *Camp* v. *State,* supra. The *Jackson* case is direct authority for our holding that this ground is without merit.

Ground 33 complains that the court erred in charging the jury that the defendant might be convicted if the evidence showed that he misapplied moneys, funds, etc., "as alleged in one or more of said transactions as set out in the indictment in Count 2. . ." The charge is in accord with the principle laid down in *Jackson* v. *State,* supra, and is not erroneous.

Ground 34 complains of this charge: "If you believe, . . . under the instructions given you, beyond a reasonable doubt, and the evidence adduced in this case, taking in connection therewith the statement of the defendant, that he did wilfully misapply the moneys, funds, securities, or credits of the Colonial Trust Company, and that he did wrongfully convert the same to his own use and benefit, or to another's than the bank's, without its knowledge and consent, and with intent to injure or defraud

the bank, either alone or in connection with other person or persons, you would be authorized to find him guilty." The gist of the criticism of the charge is that the "jury were led to believe that movant had actually admitted the wilful misapplication of the monies, funds, securities or credits of the Colonial Trust Company." The particular part of the charge alleged to bring about this harmful effect is this: "taking in connection therewith the statement of the defendant, that he did wilfully misapply the monies," etc. The criticism is hypercritical, and entirely unjustified, when the punctuation of the sentence referred to is considered. In fact, the comma between the words "defendant" and "that" in the clause last quoted would have to be removed entirely before the criticism could possibly apply. This ground is not meritorious for any reason assigned.

In conclusion, we hold that this record discloses no reversible error.

*Judgment affirmed. Broyles, C. J., concurs. Bloodworth, J., absent on account of illness.*